# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 10, 2012

## ANTOINETTE HORTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 07-00649     John Fowlkes, Judge**

---

**No. W2011-01941-CCA-R3-PC  -  Filed December 11, 2012**

---

The petitioner, Antoinette Horton, appeals the Shelby County Criminal Court's denial of her petition for post-conviction relief. The petitioner was convicted of second degree murder and sentenced to a term of eighteen years in the Department of Correction. On appeal, she contends that the court erred in denying her petition because she was denied her right to the effective assistance of counsel. Specifically, she contends that trial counsel was ineffective by: (1) failing to present a witness who would have established that the gunshot fired by the petitioner could not have killed the victim; and (2) failing to adequately advise the petitioner with regard to the State's plea offers. The petitioner also asserts that the post-conviction court's denial of her request for funding for a ballistics expert violated her Due Process rights. Following review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Neil Umsted (on post-conviction); Claiborne H. Ferguson (on appeal); and Jake Erwin (at trial), Memphis, Tennessee, for the appellant, Antoinette Horton.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; Ray Lepone and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Procedural History and Factual Background

According to the opinion filed by this court in the direct appeal of the petitioner's

case, this case arose out of a June 2006 fight at a park in the Binghampton community of Memphis between individuals from the Binghampton and Orange Mound communities during which the thirteen-year-old victim was shot to death. *State v. Antoinette Horton*, No. W2009-00277-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 3, 2010). According to the opinion:

> Officer Taurus Nolen with the Memphis Police Department testified that he and Detective Billingsly were working on a plain clothes operation in the area of Tilman Street and Mimosa Avenue in the Binghampton neighborhood on June 26, 2006. They were sitting in their cars when they saw a group of seventy to one hundred angry individuals. Officer Nolen said, "We saw weapons. I think I saw a baseball bat and something like that." The officers decided to investigate and drove toward the group, at which point Officer Nolen heard a gunshot. Officer Nolen heard squealing tires and saw a large, dark-colored vehicle driving away. He tended to the victim and radioed for assistance while Detective Billingsly maintained a perimeter. One witness told Officer Nolen that the suspect was driving a black or brown Buick Roadmaster, and he relayed that information to other officers. On cross-examination, Officer Nolen stated that there was a rivalry between individuals from the Binghampton and Orange Mound neighborhoods.

*Id*.

Multiple witnesses for the State testified that they were present at the park during the altercation and observed the victim and a group of her friends in the park that day. One witness indicated that he was aware of a prior fight between these factions earlier in the day. The witnesses each observed an unfamiliar dark-colored car approach the park and then observed four to five African-American women get out and enter the park. This group began arguing with the group of girls in the park, but they returned to their car when they saw they were outnumbered. However, the women returned from the dark-colored car and were armed with bats, a tire iron, and a knife. An older woman from Binghampton informed these women that they would not allow them to fight the younger girls in the park, and the Orange Mound group began to return to their car while making "bring it on" gestures. At this point, the girls in the park began arming themselves with bottles, rocks, and bricks off the ground. As the Orange Mound group began to enter the car, someone from the Binghampton group threw something and hit the car. The driver, described as having "a Mohawk [hair]style with braids on the side, with some hair in the middle [and] two gold teeth in her mouth," then pointed a gun out the window at the group and fired. Witnesses testified that there was nothing blocking the car's exit when the shots were fired. No witness observed any member of the Binghampton group in possession of a firearm. *Id*. A co-defendant testified at the trial and confirmed the details of other witness testimony, adding that when they were pulling away from the scene, the petitioner said, "[M]an, I think I shot somebody." Testimony was

conflicting, however, on the actual number of shots which were fired by the petitioner and on whether shots were fired by another party.

Shortly thereafter, an officer responding to the scene saw a Buick Roadmaster matching the description of the vehicle involved in the shooting driving at a high rate of speed, with the female driver "aggressively holding the steering wheel." The officer's signal to stop was ignored. While the car was still in motion, the officer observed the car doors open and shut a couple of times. The chase eventually ended when the car pulled into the driveway of a residence with the driver jumping out and running into the house. The officer and his partner chased both the driver and the passenger, who had also jumped from the car, until they were apprehended. Three other individuals remained in the car. The petitioner was identified as the driver of the car. One of the other suspects directed the officers to the gun, which was found in the middle of the street just south of where the officers had initially spotted the car. *Id*.

Crime scene investigators were called to the scene and took photographs including pictures of a park bench with blood nearby. A search of the car the defendant was driving revealed a knife, a baseball bat, and a tire tool inside of the car. Crime scene technicians also found damage to the car, which they hypothesized could have been caused by a bullet or a rock. Subsequent forensic testing confirmed that the bullet recovered from the victim "had the same rifling characteristics or lans and grooves as a test bullet fired from the revolver" recovered from the petitioner. Nonetheless, it could not conclusively be determined whether the bullet which killed the victim was fired from that particular revolver.

For these actions, the petitioner was indicted for one count of first degree premeditated murder and, along with three co-defendants, one count of aggravated assault. The petitioner proceeded to trial on a theory of self-defense. Both her testimony and those of the witnesses she presented acknowledged her presence at the scene and in the ensuing altercation. However, the petitioner contended that the other group was throwing bottles at them and that someone in that crowd appeared to make a move for a gun. The assault charge was subsequently dismissed by the State following the close of proof. Following the trial, the petitioner was convicted of the lesser-included offense of second degree murder and sentenced to serve eighteen years at 100%. On direct appeal, this court affirmed the petitioner's conviction. *Id*.

Thereafter, the petitioner filed a timely pro se petition for post-conviction relief asserting that she was denied her right to the effective assistance of counsel. Following the appointment of counsel, two amended petitions were filed on the petitioner's behalf. A hearing was then held at which the petitioner, her aunt, and trial counsel were called to testify. The first witness called was Gail Sheppard, the petitioner's aunt. Ms. Sheppard

testified that she was at the park on the day the victim was shot because she had heard that the petitioner was going to be involved in an altercation with a group who had been hassling the petitioner's sister earlier in the day. Ms. Sheppard drove to the park, but she remained inside her car. Although Ms. Sheppard did not witness the shooting, she did hear seven or eight shots, which caused her to leave and drive to a nearby apartment. She did, however, return to the area shortly thereafter and observed that the police had cordoned off the area.

According to Ms. Sheppard, upon her return, she observed the victim lying on the ground by the playground. She stated further that she observed the victim's stepfather pick up the victim and run towards the front of the park, placing the victim on a park bench when he met paramedics. Ms. Sheppard testified that she observed no blood on the victim. She seemed to indicate that it was on the park bench where police first saw the victim and conducted their investigation with that as the place the victim was shot. Incidently, Ms. Sheppard testified that the petitioner was located in a part of the park which would have made it impossible to shoot someone in the playground area.

Ms. Sheppard indicated that she informed trial counsel that she had witnessed the victim being moved "from day one." However, she was not called to testify and was informed by trial counsel that she could not be a witness because she had heard other witnesses give testimony during the trial.

Next to testify was the petitioner herself. She stated that her family had hired trial counsel to represent her and that they had proceeded to trial under a theory of self-defense. However, at the post-conviction hearing, the petitioner stated she only fired her gun up in the air and did not believe that the bullet from her gun could have hit the victim. She denied telling the police investigators that she was responsible for shooting the victim, although she acknowledged that she had signed and initialed a statement to that effect.

The petitioner also insisted that she asked trial counsel to call Ms. Sheppard as a witness, and he assured her that he would do so. However, she was never called. The petitioner also denied that she had seen the victim near the park bench where she was found, and she insisted that she herself was never anywhere near where the victim was found.

With regard to plea offers, the petitioner recalled that as the jury began deliberating, the State made two separate offers: (1) thirteen and one-half years 100% for second degree murder; and (2) fifteen years at 45% for voluntary manslaughter. The petitioner testified that trial counsel failed to explain the terms and conditions of the offers to her in detail. Despite her instant claim that she was not responsible for the shooting, the petitioner testified that she would have accepted the second offer had she understood the concept of release eligibility. However, later in her testimony, she stated it was common sense to know that "a 13.5 year

at 100%" meant serving the entire sentence; however, she denied that she understood that the same concept applied to the fifteen-year sentence, meaning she was eligible for release after serving 45%. She acknowledged that she had stated under oath that she understood the State's offers and was freely rejecting them. The petitioner also stated that while trial counsel had discussed the offers with her family, she denied discussing the matter with any family member herself prior to making the decision.

The petitioner testified that trial counsel informed her that a ballistics test had been conducted by the State on the bullet recovered from the victim and her own gun, with the results being inclusive. She further stated that trial counsel informed her that he had a separate test done in Texas and that the results indicated that the bullet had not been fired from the petitioner's gun. The petitioner never saw the actual test results, and the information was not presented to the jury. The petitioner testified that when she asked why, trial counsel told her that he did not offer the evidence because he believed it could raise an additional argument for the State and because he believed she would be acquitted. The petitioner acknowledged that no further testing had been done during post-conviction because her family could not afford to do so.

Trial counsel testified that he was hired to represent the petitioner by her family and, during the process, communicated regularly with both the petitioner and her family. He indicated that after being hired, he obtained the police report, maintained discussions with the prosecutor, requested discovery, and hired an investigator. Trial counsel also recalled specifically going to the crime scene to conduct his own examination.

Trial counsel recalled speaking with Ms. Sheppard on several occasions, but he stated that, until her testimony at the post-conviction hearing, he had never been made aware that the body had allegedly been moved. Moreover, he testified that the physical proof presented was not consistent with the body having been moved. Regardless, even if the testimony had been presented, trial counsel did not believe it would have changed the outcome of the trial in light of the overwhelming evidence to the contrary.

Trial counsel testified that, given the petitioner's statement to the police and other contributing evidence, it was decided that self-defense was the best available defense strategy. He recalled speaking with the petitioner and her family at length regarding having an independent test conducted on the bullet. However, after he received the inconclusive results from the State's test, he felt it a better decision not to have a second test done. He felt it was better to argue the State's lack of a conclusive match rather than chance receiving a confirmed match from a second test. He made this strategic decision based upon the petitioner's statement to police and upon the fact that while the State's results were inconclusive, they did indicate that the bullet from the victim possessed the same

characteristics as the petitioner's gun. Trial counsel testified he felt there was no benefit to conducting the second test. Trial counsel testified that he explained this decision to the petitioner.

Trial counsel confirmed that two offers were made by the State to the petitioner. He further testified that he always gave the same advice to all of his clients regarding release eligibility; specifically, that he could not predict what the parole board would do. He recalled informing the petitioner that a fifteen-year sentence at 45% would mean that she would be eligible for parole after serving approximately half of the sentence. Trial counsel also recalled that the State's offers were fully discussed and stated on the record during voir dire.

After hearing all the evidence presented, the post-conviction court denied the petition for relief. Thereafter, the petitioner filed timely notice of appeal.

## Analysis

On appeal, the petitioner contends that the post-conviction court erred in denying her petition because trial counsel was ineffective by: (1) failing to present a witness who could have established that the gunshot fired by the petitioner could not have killed the victim; and (2) failing to adequately advise the petitioner with regard to the State's plea offers. The petitioner also asserts that the post-conviction court's order denying funding for a ballistics expert violated her right of due process.

In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466

U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

For deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 687-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo

standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

## I. Ineffective Assistance of Counsel

### a. Failure to Call a Witness

First, the petitioner contends that trial counsel was ineffective for failing to present the testimony of her aunt, Ms. Sheppard, who could have established that the gunshot the petitioner fired could not have killed the victim. In support of her argument, the petitioner relies upon Ms. Sheppard's testimony offered at the post-conviction hearing that she was ready and available to testify at the petitioner's trial. It is not disputed that Ms. Sheppard did in fact offer her testimony at the post-conviction hearing, during which she indicated that she had seen the victim shot in an area of the park where the petitioner was not located. She stated that the area where the victim was prior to being moved was not in the petitioner's line of fire, thus offering evidence of the petitioner's innocence. The petitioner contends that trial counsel's failure to introduce this evidence prejudiced her defense, especially as there was conflicting testimony at trial over how many shots were fired.

In finding that the petitioner was entitled to no relief on this issue, the post-conviction court stated:

> Trial Counsel testified that he did not learn that [the p]etitioner wanted Sheppard to be called as [a] witness regarding the body of the Victim being moved until he heard Sheppard testify during the post-conviction hearing. Further, nothing in the police investigation or the defense investigation showed that the Victim had been moved. Even if [trial counsel] had known about Sheppard's allegations, in his legal opinion, it would have made no difference given all of the other evidence in the case.

Based upon these statements, it is apparent that the post-conviction court accredited the testimony of trial counsel over that of Ms. Sheppard and the petitioner. As has been repeatedly held, this court is bound by credibility findings of the lower court unless the evidence preponderates otherwise. *Burns*, 6 S.W.3d at 461. It is simply not the province of this court to reweigh evidence or re-evaluate credibility determinations made by the trier of fact. Trial counsel specifically testified that he was not aware of any statements at the time of the trial made by Ms. Sheppard or anyone suggesting that the victim had been moved. The post-conviction court accepted that version of events, thus rejecting the petitioner's. Like the post-conviction court, we cannot conclude that trial counsel was deficient for failing to present evidence which he was not aware existed.

Moreover, the court noted that Ms. Sheppard's testimony was inconsistent with the other evidence that was presented at trial-including the petitioner's own statement to the police and her testimony at trial, as well as the chosen theory of defense in her case. The State points out that Ms. Sheppard, by her own admission, was not even a witness to the shooting. She indicated that she fled the scene when she first heard gunshots, returning only after the police had secured the area. It is not logical to assume that police, who have already secured and blocked a street, would be unaware of people moving bodies around a crime scene. Thus, in light of the fact that Ms. Sheppard did not witness the actual event, that the petitioner acknowledged her own responsibility, that the petitioner was observed by eyewitnesses firing into the crowd, and that no physical evidence supported the claim that the victim was moved, we cannot conclude that the post-conviction court erred in its determination that the petitioner had failed to show how the testimony would have affected the outcome of her trial. As such, no relief is warranted.

### b. Advice on Plea Offers

Next, the petitioner contends that trial counsel was ineffective for failing to adequately explain the two offers proffered by the State, as well as the concept of release eligibility. She contends that, had she properly understood the offers, she would have pled guilty.

The petitioner's argument in this case rests solely on her assertion that she was not properly informed regarding the plea offers and did not understand the consequences of each agreement. However, trial counsel's testimony stands in stark contradiction to this, as he specifically testified that he explained the offers to the petitioner and her family. Trial counsel expressly stated that he explained the concept of the release eligibility, as well as the role of the parole board in granting the release. The post-conviction court also noted that the petitioner was expressly voir dired on this very subject, and she stated that she understood the agreement and wanted to plead guilty. Again, the post-conviction court accredited trial counsel's testimony, and we will not re-evaluate such a determination when no evidence preponderates against it. *See Burns*, 6 S.W.3d at 461. The petitioner has simply failed to carry her burden in this case.

## II. Denial of Funding for a Ballistics Expert

Next, the petitioner contends that the post-conviction court's denial of her request for funding for an expert during the post-conviction process resulted in a violation of Due Process. During the post-conviction hearing, the petitioner raised the issue of whether trial counsel was ineffective for failing to hire a ballistics expert and have a second test conducted on the bullet recovered from the victim. In this appeal, she asserts that she carried her burden of establishing that trial counsel was deficient in this regard, but she argues that she was

precluded from establishing prejudice by the post-conviction court's denial of her request to obtain a ballistics expert to testify at the hearing.

The petitioner acknowledges that the rules of the Tennessee Supreme Court specifically prohibit the authorization of expert services in non-capital post-conviction proceedings. Tenn. Sup. Ct. R. 13 § 5(a)(2) ("In non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved."). She argues, however, that application of this rule violates her right to Due Process by precluding her ground for relief from being established. She states that application of Rule 13 is a classic example of a Due Process violation and "essentially barred the indigent [petitioner] from presenting a viable claim of ineffective assistance of counsel due to her lack of finances."

As an initial matter, we are unable to agree with the petitioner that deficient performance on the part of trial counsel was established at the hearing, and it is not specifically addressed on appeal. That conclusion itself would prohibit a determination that ineffective assistance of counsel was established regardless of this issue regarding the prejudice prong of the claim. We, nonetheless, address the petitioner's contentions with regard to Due Process.

The petitioner's argument asks this court to make a determination that application of a supreme court rule results in a violation of our constitution. However, her argument ignores that we, as a lower court, are bound by the determinations made by the Tennessee Supreme Court. That court has specifically found no state entitlement to expert assistance for non-capital post-conviction petitioners and held that due process rights of non-capital post-conviction petitioners were sufficiently protected. *Davis v. State*, 912 S.W.2d 689, 696 (Tenn. 1995). As such, absent a directive from our supreme court, we are precluded from reaching the conclusion that the petitioner is entitled to relief on this issue.

**CONCLUSION**

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE